AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
MAR 2 4 2023
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

United States of America

v.

Juan Josue Esquivel Sanchez,

Defendant(s)

Case No.  2:23-mj-01447-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 23, 2023 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Gerald West, Special Agent, DEA   by telephone
Complainant's signature

Gerald West, Special Agent, DEA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 3/24/2023

Judge's signature

City and state: Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
Printed name and title

AUSA: Angela Makabali, ext. 2331

**AFFIDAVIT**

I, Gerald West, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Juan Josue ESQUIVEL SANCHEZ for a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

2. This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described in Attachment A-1:

   a. A silver iPhone with IMEI 359836517294744 ("SUBJECT DEVICE 1");

   b. A purple Samsung Galaxy with IMEI 359419300029757 ("SUBJECT DEVICE 2"); and

   c. A gray iPad with serial number GG7YD0UTJF89 ("SUBJECT DEVICE 3," and collectively with SUBJECT DEVICES 1 and 2, the "SUBJECT DEVICES").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), possession with intent to distribute controlled substances; 21 U.S.C. § 846, conspiracy and attempt to distribute controlled substances; and 18 U.S.C. § 924(c), possession of a firearm in furtherance of a drug trafficking crime (together, the "SUBJECT OFFENSES").

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA"). I have been employed by the DEA since August 2019. I am currently assigned to the DEA's Los Angeles Field Division, Enforcement Group 5, which investigates drug trafficking and money laundering offenses in violation of Titles 18 and 21 of the United States Code. I have received 19 weeks of specialized training in Quantico, Virginia, pertaining to drug trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures.

6. Throughout my law enforcement career, I have received numerous hours of training in drug investigations, investigative techniques, and surveillance and evidence collection. I have been a case agent and co-case agent on multiple investigations involving drug trafficking in the Southern California area. These investigations have focused on drug proceeds and monetary instruments derived from drug activities, and conspiracies associated with drug offenses. I have interviewed defendants,

informants, and witnesses who have personal knowledge regarding drug trafficking organizations.

7. I have participated in multiple drug investigations that involved the manufacture, possession, and distribution of controlled substances such as fentanyl, methamphetamine, and cocaine. I have also participated in the execution of search warrants and arrest warrants involving drug trafficking crimes.

### III. **SUMMARY OF PROBABLE CAUSE**

8. Since October 2022, law enforcement agents have been investigating a confidential source ("CS") for the possession and distribution of fentanyl and methamphetamine.[1] In December 2022, the CS was arrested by the El Monte Police Department ("El Monte PD") for possession and distribution of a controlled substance.

9. After the CS's arrest, s/he was interviewed by law enforcement and provided information indicating that a residence located on Troost Avenue, in North Hollywood, CA (the "Troost Avenue residence"), was a storage place for kilogram quantities of various controlled substances.

10. On March 23, 2023, the Los Angeles Sheriff's Department ("LASD") conducted a traffic stop of a vehicle observed leaving the area of the Troost Avenue residence. LASD

---

[1] The CS's criminal history contains convictions for petty theft, possession and distribution of controlled substances, grand theft, smuggling controlled substances into prison, making threats, firearm possession, domestic violence, possession of paraphernalia, and traffic violations. The CS was on active probation for carrying a firearm at the time of his and arrest interview by El Monte PD. The CS has not previously worked with law enforcement.

3

Deputy Van Horn stated that in the open center console on the car was a clear plastic container with white powdered substance that appeared to be a controlled substance. LASD deputies arrested the driver, later identified as Juan Josue ESQUIVEL SANCHEZ. Inside ESQUIVEL SANCHEZ's car, officers found approximately two 30-pound containers of a crystalline-substance that presumptively tested for a total of 60 pounds of methamphetamine; approximately 10 pounds of liquid suspected to be methamphetamine; approximately 20,000 pills, including pills appearing to be M30s, and suspected of containing fentanyl; approximately eight pounds of white crystalline substance also appearing to be methamphetamine, and approximately one ounce of marijuana. Two firearms and the SUBJECT DEVICES were also seized from ESQUIVEL SANCHEZ. SUBJECT DEVICES 1 and 2 were on ESQUIVEL SANCHEZ's person, and SUBJECT DEVICE 3 was in the trunk of the vehicle he was driving.

## IV. STATEMENT OF PROBABLE CAUSE

11. Based on my observations and participation in this investigation, my review of investigative reports prepared by other law enforcement officers who were involved in this investigation, as well as my interview of witnesses, I am aware of the following:

### A. The CS Tells Law Enforcement About the Troost Avenue Residence

12. On December 14, 2022, the El Monte PD conducted an enforcement operation during which the CS was arrested for the

possession of controlled substances seized from his vehicle and residence in Hawthorne, CA.

13. After the CS's arrest, DEA SA Toan Nguyen, El Monte PD Detective Tyler Dominguez, and I interviewed the CS. I saw and heard Detective Dominguez Mirandize the CS before the interview. The CS acknowledged that s/he understood the CS's rights and agreed to speak with law enforcement. Among other information, the CS told us that an individual he works for stores drugs at the Troost Avenue residence, at times in kilogram quantities.

14. On January 17, 2023, SA Nguyen and I spoke further with the CS about Troost Avenue residence. During the interview the CS told us that an individual who resides at the Troost Avenue residence is a large-scale distributor of fentanyl.

### B. Surveillance of Target Residence, Traffic Stop and Arrest of ESQUIVEL SANCHEZ on March 23, 2023

15. On March 23, 2023, members of the DEA and the LASD established surveillance of the Troost Avenue residence. Surveillance units set up in positions to observe persons or vehicles entering or exiting the property.

16. At approximately 4:00 p.m., LASD Detective Mario Magdaleno observed a gray Infinity Q50 sedan bearing California license plate BP04A56 (the "Target Vehicle"), travel south on Troost Avenue from Vanowen street and pass the Troost Avenue residence. According to Detective Magdaleno, as the Target Vehicle passed the residence, he observed the driver, later identified as ESQUIVEL SANCHEZ, appear to look down the driveway

5

of the Troost Avenue residence. Detective Magdaleno further stated that he then saw the Target Vehicle turn and park on Archwood Street, perpendicular to Troost Avenue and south of Vanowen Street, and the driver, later identified as ESQUIVEL SANCHEZ, exited the Target Vehicle and walked in the direction of the Troost Avenue residence. Detective Magdaleno stated that a few minutes later, he saw ESQUIVEL SANCHEZ enter onto the property of the Troost Avenue residence. LASD Detective Asael Saucedo stated that he observed ESQUIVEL SANCHEZ walk towards the rear of Troost Avenue residence, where there was a detached garage on the property.

17. A few minutes later, Detective Magdaleno stated that he saw ESQUIVEL SANCHEZ leave through the front gate of the Troost Avenue residence, walk towards the Target Vehicle, and re-enter Target Vehicle. According to Detective Magdaleno, ESQUIVEL-SANCHEZ then drove away from the residence traveling westbound on Archwood Street.

18. At approximately 4:45 p.m., LASD Deputy James Van Horn observed the Target Vehicle traveling north on Radford Street near Vanowen Street. According to reports, Detective Magdaleno conveyed to Deputy Van Horn, who was in a patrol vehicle with police markings, the vehicle's description and license plate BP04A56. Deputy Van Horn conducted a California Department of Motor ("DMV") inquiry of the vehicle's license plate and discovered that the Target Vehicle's license plate was expired in violation of Section 5204 of the California Vehicle Code.

19. According to Deputy Van Horn, after seeing the Target Vehicle traveling north on Radford Street, he and his partner, LASD Deputy Estevan Perez stopped the Target Vehicle for the California Vehicle Code violation.

20. Deputy Perez approached the driver side of the vehicle and began speaking with the driver in Spanish. The driver stated that he did not have a driver's license. At the same time as Deputy Perez was speaking with ESQUIVEL SANCHEZ, Detective Van Horn approached the passenger side of the vehicle and saw a clear plastic container in the open center console with a what appeared to be a white powder-like substance inside. Deputy Van Horn believed this appeared to be narcotics residue, or drug paraphernalia, based on his training and experience.

21. Deputy Perez told me that a few minutes later, he ordered ESQUIVEL SANCHEZ to place his hands on the steering wheel because he observed what appeared to be a knife hanging on ESQUIVEL SANCHEZ's waistband on his lap. According to Deputy Perez, he then told ESQUIVEL SANCHEZ to remove his seatbelt. Deputy Van Horn stated that he observed ESQUIVEL SANCHEZ begin to reach towards the front of his waistband and simultaneously lift his shirt. Based on his training and experience, Deputy Van Horn believed ESQUIVEL SANCHEZ was reaching towards a weapon. Furthermore, Deputy Van Horn stated that he feared for his life and Deputy Perez's life, so he removed his LASD issued firearm while Deputy Perez ordered ESQUVEL SANCHEZ not to move. According to Deputy Van Horn, Deputy Perez secured and detained ESQUIVEL SANCHEZ, and Deputy Van Horn saw what appeared to be a

7

brown pistol grip of a firearm protruding from ESQUIVEL SANCHEZ's waistband. Deputy Van Horn further stated that he searched ESQUIVEL SANCHEZ's pockets while he remained seated and found approximately $5,000 in United States currency, SUBJECT DEVICES 1 and 2, two firearms, and the knife on ESQUIVEL SANCHEZ's person. Deputy Van Horn stated that both firearms were loaded.

22. Deputy Perez stated that he gave ESQUIVEL SANCHEZ commands to exit the vehicle, which ESQUIVEL SANCHEZ did.

23. Deputy Van Horn conducted a search of the vehicle and discovered the following:

    a. In the rear driver's side seat, a plastic shopping bag that contained three individual plastic wrapped packages. Based on his training and experience, the packing and the sharp edges of the package contents led Deputy Van Horn to believe that the packages contained approximately eight pounds of suspected methamphetamine.

    b. Inside of the trunk, approximately 20,000 pills, including M30 pills, suspected of containing fentanyl, two plastic containers containing a crystalline substance that presumptively tested positive for methamphetamine and weighed approximately 60 pounds, three plastic containers containing approximately 10 pounds of a liquid substance believed to be liquid methamphetamine, one glass pipe with a crystal-like substance believed to be methamphetamine inside, and approximately one ounce of marijuana. SUBJECT DEVICE 3 was also in the trunk of the car.

24. Deputies arrested ESQUIVEL SANCHEZ and transported him to the LASD Santa Clarita Station.

### C. Interview of ESQUIVEL SANCHEZ on March 23, 2023

25. LASD Detective Magdaleno told me the following:

    a. Following ESQUIVEL SANCHEZ's arrest, ESQUIVEL SANCHEZ was interviewed in Spanish by LASD detectives Magdaleno and Christian Perez, who Mirandized him.

    b. ESQUIVEL SANCHEZ stated that he understood his rights and agreed to speak with the detectives.

    c. ESQUIVEL SANCHEZ stated that he purchased approximately three packages of methamphetamine for $900 and two semi-automatic pistols for $1,000 from a Hispanic male who lives on Troost Avenue.

    d. ESQUIVEL SANCHEZ stated that he has purchased drugs from this same individual who lives on Troost Avenue for approximately one year and that he buys drugs from this individual approximately two times a week.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

26. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

27. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

   a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

   b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience,

12

individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

28. As used herein, the term "digital device" includes the SUBJECT DEVICES.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    c. It is also likely that a significant portion of the digital data to be reviewed will be in a language other than English, for which reviewers may need a translator.

31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

        c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ESQUIVEL SANCHEZ's thumb and/or fingers on the devices; and (2) hold the devices in front of ESQUIVEL SANCHEZ's face with his eyes open to activate the facial-, iris- , and/or retina-recognition feature.

32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

33. For all of the reasons described above, there is probable cause to believe that Juan Josue ESQUIVEL SANCHEZ has committed a violation of 21 U.S.C § 841(a)(1) (possession with intent to distribute a controlled substance). There is also probable cause that the items to be seized in Attachment B will be found in the SUBJECT DEVICES, described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 24th day of
March, 2023.

_____
THE HON. JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

17